IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

KIMBALL GOINS                                                                     PLAINTIFF

VS.                              CIVIL NO. 04-5065

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION            DEFENDANT

**MEMORANDUM OPINION**

Kimball Goins (hereinafter "plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Act.

**Background:**

The applications for DIB and SSI now before this court were filed on May 9, 2002, alleging disability beginning March 1, 1999,[1] due to constant pain in his back, feet, and legs; coronary artery disease; diabetes; sleep apnea; seizure disorder; emphysema; and, skin cancer. (Tr. 447-449, 705-708, 721). An administrative hearing was held on September 21, 2000. (Tr. 723-753). On March 30, 2001, the Administrative Law Judge ("ALJ"), issued an unfavorable decision. (Tr. 390-399). The Appeals Council denied review, and plaintiff appealed that decision to this court. (Tr. 414-415, Doc. # 1). Subsequent to a motion to remand filed by the Commissioner, this case was remanded to the ALJ on

---

[1] Plaintiff filed previous applications for benefits on September 21, 2000. (Tr. 15). Subsequent to an administrative hearing, the ALJ rendered an unfavorable decision on November 16, 2000. The Appeals Council then denied review. As such, plaintiff's onset date can be no earlier than November 17, 2000. (Tr. 15).

January 10, 2005. (Doc. # 5). A second administrative hearing was then held on July 22, 2003. (Tr. 754-777). Plaintiff was present and represented by counsel.

At the time of the hearing, plaintiff was fifty-one years old, and possessed a high school education. (Tr. 16). He had past relevant work ("PRW"), as a warehouse delivery truck driver and a laborer. (Tr. 16).

On September 25, 2003, the ALJ issued a written decision finding that plaintiff's condition was severe, but did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 25). After discrediting plaintiff's subjective allegations, the ALJ concluded that he maintained the residual functional capacity ("RFC") to perform a full range of light work, limited only by his ability to occasionally stoop and crouch. Utilizing the Medical-Vocational Guidelines (the "Grids"), the ALJ then determined that plaintiff could perform work that exists in significant numbers in the national economy. (Tr. 26).

The Appeals Council declined to review this decision. (Tr. 12-14). Subsequently, the Commissioner filed a motion to reinstate, and the case was reinstated on March 11, 2005. (Doc. # 6, 7). This case is before the undersigned by consent of the parties. Although both parties were given the opportunity to file appeal briefs, plaintiff chose not to do so. (Doc. # 9).

**Discussion:**

The issue before this court is whether the Commissioner's decision is supported by substantial record evidence. "We will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Id*. *See also Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000). "However, our review 'is more

than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision.' Nevertheless, as long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir.1995), or 'because we would have decided the case differently.'" *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001)(citations omitted).

A five-part analysis is utilized in social security disability cases. *See e.g., Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). Applying this analysis, the ALJ must determine, sequentially, the following: 1) whether the claimant is employed; 2) whether the claimant has a severe impairment; 3) whether the impairment meets a listed impairment; 4) whether the impairment prevents the claimant from doing past work; and 5) whether the impairment prevents the claimant from doing any other work. *Id*.; *see also* 20 C.F.R. § 404.1520.

If the claimant fails at any step, the ALJ need not continue. "The claimant carries the burden of establishing that [he] is unable to perform [his] past relevant work, i.e., through step four, at which time the burden shifts to the Commissioner to establish that [he] maintains the residual functional capacity to perform a significant number of jobs within the national economy." *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001)(citing *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000)).

**Discussion:**

Of particular concern to the undersigned is the ALJ's RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th

Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "Under this step, the ALJ is required to set forth specifically a claimant's limitations and to determine how those limitations affect her RFC." *Id*.

In the present case, the ALJ concluded that plaintiff could perform a full range of light work. (Tr. 23). In so doing, he relied on the opinion of a consultative physician. (Tr. 658-665). We note that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999). Because none of plaintiff's treating physicians have completed an RFC assessment for the time period in question, we believe remand is required to allow the ALJ to obtain assessments from these physicians. *See Vaughn v. Heckler*, 741 F.2d 177, 179 (8th Cir. 1984) (If a treating physician has not issued an opinion which can be adequately related to the disability standard, the ALJ is obligated to address a precise inquiry to the physician so as to clarify the record). Accordingly, on remand, the ALJ is directed to address interrogatories to the physicians who have treated plaintiff, asking the

physicians to review plaintiff's medical records; to complete an RFC assessment regarding plaintiff's capabilities during the time period in question; and, to give the objective basis for their opinions, so that an informed decision can be made regarding plaintiff's ability to perform basic work activities on a sustained basis during the relevant time period in question. *Chitwood v. Bowen*, 788 F.2d 1376, 1378 n.1 (8th Cir. 1986); *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985).

We also note that the record reveals the following. Records indicate that the plaintiff has a history of nausea, vomiting, chest pain, coronary artery disease, hypertension, hyperlipidemia, possible chronic obstructive pulmonary disease ("COPD") secondary to tobacco use, seizure disorder, and diabetes. (Tr. 285, 364-365, 675). An overnight sleep study also revealed obstructive sleep apnea with disoriented breathing and oxygen desaturations. (Tr. 344).

Plaintiff underwent a left heart catheterization, LV angiogram, and selective coronary angiograms on August 13, 2000. (Tr. 355). The tests revealed arteriosclerotic heart disease with moderate stenoses of the distal circumflex and left ventricular diastolic dysfunction. (Tr. 356). Plaintiff's left ventricular ejection fraction rate was sixty percent. (Tr. 618).

On September 11, 2000, Dr. Michael Morse wrote a letter to Dr. Victor Biton, asking him to evaluate plaintiff. (Tr. 341). He noted that plaintiff had a history of convulsive syncope, and had experienced several episodes of this. Dr. Morse stated that plaintiff had a negative evaluation with a negative MRI and ECG. However, he indicated that plaintiff had experienced spells, which he thought might be partial seizures. As such, he had prescribed trials of Depakote, Dilantin, and Tegretol, none of which helped plaintiff. (Tr. 341).

On November 15, 2000, records indicate that plaintiff has passed out on the couch, while experiencing a coughing spell. (Tr. 612). As a result, he fell and hit his nose. (Tr. 613). Records reveal that plaintiff had also been diagnosed with sleep apnea, and was compliant with his C-PAP machine. (Tr. 612). Although plaintiff reported a history of seizure disorder, he and his wife denied any seizure activity at this time. Aside from a bruised and swollen nose, a physical examination was unremarkable, and x-rays of his cervical spine were negative. Further, a CT scan was also negative, showing no evidence of a broken nose. (Tr. 612).

On May 13, 2001, plaintiff was admitted to the hospital due to chest pain. (Tr. 512, 514). Cardiac enzymes and serial electrocardiograms were performed, and all were negative. (Tr. 512). A cardiac catheterization procedure was performed on May 16, 2001, resulting in the placement of a stent. Plaintiff was discharged home on May 17, 2001. His discharge diagnoses included chest pain, percutaneous transluminal coronary angioplasty ("PTCA")/stent of circumflex, COPD, obesity, and sleep apnea. (Tr. 512). Further, his discharge medications included Ecotrin, Plavix, Lamictal, Demodex, Lisinopril, Zocor, Prilosec, Lotrel, and TNG. (Tr. 513).

However, this same date, plaintiff was re-admitted to the hospital. (Tr. 505). After returning home for a short time, plaintiff developed upper sternal chest pain and suffered an acute inferior myocardial infarction. As such, he returned to the emergency room, shortly after which, he developed ventricular fibrillation requiring cardioversion. Plaintiff was then admitted for urgent cardiac catheterization. Testing revealed left ventricular hypertrophy, a left ventricular ejection fraction rate of sixty percent, and twenty percent in-stent stenosis in the left anterior descending coronary artery. (Tr. 510). Following the procedure, he was placed on ReoPro and Heparin. (Tr.

505). Chest x-rays conducted on May 18, 2001, were normal, revealing no acute abnormality. (Tr. 507). Over the next few days, he recovered without complications. (Tr. 505). He had no further angina or shortness of breath, although he did report some chest wall soreness. After experiencing some intermittent second degree AV block, plaintiff's Lopressor was discontinued. Otherwise, his vital signs remained stable, and he was released home on May 24, 2001, in satisfactory condition. (Tr. 505).

On June 4, 2001, Dr. Haisten referred plaintiff for phase II of cardiac rehabilitation. (Tr. 583). His major referring diagnosis was a myocardial infarction. (Tr. 583).

On July 23, 2001, plaintiff denied chest pain, but reported persistent shortness of breath. (Tr. 579). He indicated that he could not stand the heat, and kept a headache most of the time. As such, an EKG was ordered. Dr. Haisten then directed him to discontinue Coumadin and ordered blood tests. (Tr. 580). Then, on October 9, 2001, an exercise tolerance stress test revealed an abnormal resting ECG. (Tr. 575).

On December 19, 2001, plaintiff was falling asleep much more than normal. (Tr. 672). He also stated that he was unable to use his C-PAP. Following a normal examination, Dr. Bingham stressed the need to correct plaintiff's sleep apnea. She stated that his daytime fatigue would not improve until his apnea was properly treated. As such, she referred him to an ear, nose, and throat specialist to be evaluated for corrective surgery. Dr. Bingham noted no changes in plaintiff's hypertension or diabetes. (Tr. 672).

On February 01, 2002, plaintiff presented at the ER, reporting that he had experienced a seizure about fifteen minutes prior to his arrival. (Tr. 569, 571). When he arrived at the ER, plaintiff

was sleepy. Records indicate that plaintiff had not been taking the full dosage of his anti-seizure medication. (Tr. 571).

On February 7, 2002, plaintiff opined that rehabilitation had really helped him. (Tr. 572). He had been going for the past five to six months. Plaintiff stated that he had not experienced any chest pain, but had continued complaints of shortness of breath. (Tr. 572).

On February 27, 2002, plaintiff indicated that he had experienced a seizure the previous Monday. (Tr. 670). Records indicate that he had started tapering his seizure medication down to one a day, when he had this seizure. A physical examination revealed no abnormalities. Accordingly, Dr. Bingham prescribed Lamactil to be taken as prescribed. Further, she placed him on a low dosage of thyroid medication to treat his hypothyroidism. She also prescribed a trial of Skelaxin to treat his back pain. (Tr. 670).

On June 11, 2002, plaintiff complained of swelling to his fingers, ankles, and calves. (Tr. 647). He stated that it felt like he had an ace bandage around his calves. As such, plaintiff was directed to increase his dosage of Demadex. (Tr. 647).

On June 13, 2002, plaintiff reported experiencing shortness of breath "all of the time," even when sitting. (Tr. 543). He indicated that earlier that month, he had attempted to perform garden work, but his heart rate when up and his chest became tight. Plaintiff stated that his heart was "beating like a bass drum." However, an examination revealed a normal heart rate and rhythm. As such, Dr. Haisten referred plaintiff to a dietician for a weight evaluation and diet plan. (Tr. 544).

On July 18, 2002, plaintiff reported two episodes of mid-sternal chest pain. (Tr. 540). A resting ECG revealed small inferior Q waves. Further, a Cardiolite treadmill test showed evidence of an inferior infarction and ischemia. (Tr. 541).

On July 24, 2002, plaintiff underwent left heart catheterization, LV angiogram, and selective coronary angiograms. (Tr. 528, 531). Testing revealed a normal left ventricular ejection fraction rate of sixty percent, occlusion of the ostia of the distal circumflex coronary artery, and twenty-five percent proximal stenosis of the right coronary artery. (Tr. 528-529). Medical management was recommended. (Tr. 530). His discharge medications included Soma, Lamictal, Lotrel, Nitrobid, Nexium, Lisinopril, and Zocor. (Tr. 553).

On August 13, 2002, plaintiff noted some exertional pain, while attending the rehabilitation program. (Tr 526). A Cardiolite treadmill test revealed an inferior myocardial infarction with ischemia. Plaintiff was then admitted to the hospital for a diagnostic study and intervention, if necessary. (Tr. 526).

As this evidence reveals that plaintiff has been hospitalized on numerous occasions due to heart related impairments and seizures, we believe that the ALJ should reevaluate this evidence, in conjunction with the RFC assessments he obtains from plaintiff's treating physicians. *Collins ex rel. Williams v. Barnhart*, 335 F.3d 726, 730 (8th Cir. 2003) (holding that a treating physician's opinion is generally entitled to substantial weight). Special attention should be paid to plaintiff's weight limitations, given his level of heart disease.

The ALJ also failed to consider evidence indicating that plaintiff had financial constraints that affected his ability to obtain medication and treatment. In fact, on September 17, 2002, plaintiff

owed Northwest Arkansas Surgical Clinic $150,000, which had to be paid before the facility would admit him for any elective procedures. (Tr. 654). While it is for the ALJ in the first instance to determine a plaintiff's motivation for failing to follow a prescribed course of treatment, or to seek medical attention, such failure may be excused by a claimant's lack of funds. *Tome v. Schweiker*, 724 F.2d 711, 714 (8th Cir. 1984); *Jackson v. Bowen*, 866 F. 2d 274, 275 (8th Cir. 1989). "Although it is permissible in assessing the severity of pain for an ALJ to consider a claimant's medical treatment and medications, the ALJ must consider a claimant's allegation that he has not sought medical treatment or used medications because of a lack of finances." *Dover v. Bowen*, 784 F.2d 335, 337 (8th Cir. 1986) (citing *Tome v. Schweiker*, 724 F.2d at 714). Economic justifications for lack of treatment can be relevant to a disability determination. *Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992). Therefore, on remand, the ALJ is directed to further develop the record concerning plaintiff's financial ability to obtain treatment and medication.

**Conclusion:**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and, therefore, the denial of benefits to the plaintiff should be reversed and this matter should be remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this the 15th day of March 2006.

/s/ Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE